Florian J. Brylski v. Commissioner.
Brylski v. Commissioner
Docket No. 18614.
United States Tax Court
1949 Tax Ct. Memo LEXIS 82; 8 T.C.M. (CCH) 813; T.C.M. (RIA) 49222; September 7, 1949
*82 1. Amount of petitioner's taxable income determined. 2. Held, petitioner, a doctor, filed a false and fraudulent return with intent to evade tax. Kevin Killeen, Esq., for the petitioner. William A. Schmitt, Esq., for the respondent. VAN FOSSAN Memorandum Opinion VAN FOSSAN, Judge: The respondent determined a deficiency in income tax for the year 1944 in the amount of $25,194.51 and a penalty for filing a false and fraudulent return in the amount of $12,597.25. [The Facts] Dr. Florian J. Brylski, the petitioner herein, was graduated from medical college in 1927 and has been practicing in Buffalo since 1930. He has specialized in surgery but has also a general practice, including obsttrics. Petitioner's tax return for the year 1944 was filed with the collector of internal revenue for the 28th district of New York at Buffalo, New York, on January 15, 1945. The doctor's sources of income consisted of a salary contract with D.N.X. (Ford) Engine Corporation; compensation cases - the fees for which were paid by insurance companies; fees from patients under the Western New York Medical Plan; private cases, including office, home and hospital cases; fees *83 for services rendered for testifying in court actions; and fees split with other doctors who referred operative cases to him. Except for interest and dividends in the amount of $1,240, he had no other sources of income. Prior to November 1, 1942, the taxpayer did not have an office assistant or bookkeeper. On that date he employed such an assistant who worked full time until August 7, 1943. Thereafter until she came back to work in June 1944, petitioner had no bookkeeper. Beginning with June 1944 the bookkeeper put in from two to four hours each day. She had had business training and understood the doctor's business thoroughly. The total amount of salary and office expenses paid by petitioner during 1944 was $450. Prior to 1942 petitioner maintained as the basis of his records, a standard book used by most physicians, called a Daily Diary. His record in respect to compensation cases, medical plan cases, salary received from D.N.X. Engine Corporation and cases requiring the filling out of forms or letters were carefully kept at all times. The "records" with respect to other patients, covering a large part of petitioner's practice, were purportedly kept in a memorandum book and *84 consisted chiefly of a large number of scraps of paper, backs of envelopes, and similar loose leaf memoranda. On such memoranda petitioner would enter the patient's name and amount collected. After petitioner employed a bookkeeper in June 1944 she began keeping the record known as "The Blue Book" and she undertook gathering information and making entries in such book for the months of January to June 1944, representing the period before she resumed working for petitioner. From June to December of that year she kept the Blue Book currently from month to month. Petitioner's income tax return for 1944 was prepared by one Miss Wisniewski, to whom the information was furnished by petitioner. She performed only the clerical work of preparing the return and received no payment therefor. On November 8, 1945, the revenue agent charged with investigating the 1942, 1943 and 1944 tax returns of petitioner, first visited petitioner's office and asked for the records which formed the basis of the figures shown in the 1944 tax return. At this time the agent was furnished with the Daily Diary marked "1944" with loose leaves in the back and a sheaf of receipted bills and canceled checks, and *85 was told by petitioner that these were the only records maintained during the year 1944. He was also furnished a Diary for 1943. On the occasion of his second visit to petitioner's office on December 10, 1954, the revenue agent was furnished the Blue Book. The Daily Diary which had been furnished the revenue agent was not made up until the year 1945. Petitioner testified "We were told to get the records ready, and we were scared as a matter of fact, and so we quickly got everything together * * *." The fact that the record was made up in 1945 was not revealed to the revenue agent. After studying petitioner's records the revenue agent checked his bank accounts to determine the amount of his deposits, visited the hospitals to ascertain the number of patients listed in petitioner's name and consulted with many of petitioner's patients to check or attempt to verify the memoranda and other records. The Diary for 1944 contained the names of 47 operative patients at Emergency Hospital. Twenty-one of the patients, of whom petitioner had a record, were called as witnesses and, in every instance, checked the amount which they testified had been paid was more than the amount shown on the *86 petitioner's records. The Diary for 1944 showed $550 having been received as fees from four other doctors who shared fees with petitioner. Petitioner admitted on the stand that he received $7,350.60 from the four doctors. [Opinion] In petitioner's return he disclosed total receipts from his profession of $21,100, from which he deducted as expenses $10,858.16, leaving a net from his profession of $10,241.84, to which he added $2,787.31 as salary from D.N.X. Engine Company and $1,240 as dividends and interest, making a total of $14,269.15, and, after making other adjustments, a total net income of $12,732.93. In his computation of the deficiency respondent added $39,414.52, making a net income as adjusted of $52,147.45. In his petition, petitioner concedes a taxable net income of $20,965.28. By amended answer respondent alleges that petitioner understated the income received by him during the taxable year in the amount of $39,414.52. At the hearing petitioner admitted a gross income of $34,019.91. Petitioner, in testimony before the Special Intelligence Unit about a year after the revenue agent's first visit in November 1945, admitted that "after looking over the records, *87 I might have made some omissions there, probably amounting to ten or fourteen thousand dollars in 1944." The petitioner had bank deposits during 1944 in the amount of $26,750.81. Of this amount petitioner testified $5,000 belonged to his mother. He testified he also had between $2,000 and $3,000 cash in his office safe at the beginning and end of the year. In addition to the safe, petitioner maintained a safety deposit box where he kept cash in an undisclosed amount. On petitioner's testimony approximately $14,000 was unaccounted for. The hospital records showed 791 patients as being patients of petitioner during the year 1944 in Emergency Hospital. Two hundred seventy-four of these were referred to him by other doctors with whom he split fees. From a balance of 517 patients the revenue agent deducted 59 patients as readmissions or charitable patients. Of the 458 remaining patients only 47 were listed in the Diary, leaving 411. Of the 411 only 227 were included in the Blue Book, leaving a balance of 184 cases unaccounted for as to fees. For the purpose of his audit the revenue agent used an average fee for such omitted patients. With the above factual picture as background, we *88 are presented with two questions, (1) What was petitioner's taxable income for 1944, - and (2), was petitioner's return for 1944 filed by him with fraudulent intent to evade taxes due? These questions are considered in order. Because of the condition of petitioner's records, their gross inaccuracies and extensive and important omissions, this case defies precision. Petitioner, on whom rests the burden of proof of error as to the deficiency, admits error and shortcomings in the proof but contends respondent also errs and that his claims of income received are extravagant and unsupported. By his own admission, petitioner's records are utterly unreliable and, in considerable part, compiled after the controversy arose. Petitioner returned $21,100 as his gross receipts from his profession. At the hearing he made no defense of this figure and admitted that his gross receipts exceeded $34,000. From all the evidence we believe his income was considerably greater than this. Applying the rule of the Cohan case, [1] that, in such situations, we should make as close an approximation as we can, bearing heavily, if we choose, on the taxpayer whose inexactitude is of his own making, we find that *89 petitioner received income which he failed to report for taxation for the year 1944 in the sum of $20,360. This amount will be added to petitioner's income as returned by him in the computation consequent hereon. There remains the issue of fraud, as to which the burden of proof is on the Government. In , affirmed , we said: "Under the revenue laws every taxpayer is, in the first instance, his own assessor. He determines the amount of tax due. This privilege carries with it a concurrent responsibility to deal frankly and honestly with the Government - to make a full revelation and fair return of all income received and to claim no deductions not legally due. * * * It is a maxim of our law that, in dealing with the Government, taxpayers must turn square corners. "The responsibility of making a tax return is personal and rests squarely on the shoulders of the taxpayer. When he makes oath to the correctness of his return he assumes responsibility thereof. Only in rare instances can the consequences incident thereto be delegated to another." On the subject of intent in *90 the same case we observed: "Nor is the absence of fraudulent intent necessarily established by the protestations of innocence of the parties, however vigorous. ; affd. ; . It is to be gleaned from all the facts and the normal and reasonable inference therefrom. Though intent is a state of mind, its character is to be established, as other facts are established, by weighing all of the evidence and applying the proper measure of proof." In , which case also involved a question of fraud, we stated: "Petitioner pleads that he was a busy man and delegated all details to others. This fact does not excuse him, nor palliate his conduct in swearing to the truth of divergent statements of fact. An oath is not to be taken lightly and a party has no basis for complaint if he be held to strict account for the truth of sworn documents or testimony. It is but a short step from carelessness, indifference to accuracy, and slipshod practice such as characterized the dealings of taxpayer with the Government to the fraudulent *91 evasion of taxes. * * *." Much of the foregoing might, with entire pertinency, be said of the present situation. The absence and insufficiency of petitioner's records, his indifference to his duty to make an honest return, and other slipshod practices, adequately exemplified in the record, the amount of income involved in the omissions, the necessary implication from successive admissions of taxpayer that former sworn statements of income were grossly incorrect, and the wholly insufficient excuse for his conduct that he was "very busy" and that "naturally some of the things we should have done fell by the wayside," all lead us to conclude that petitioner's return for 1944 was filed with the deliberate intention to evade taxes due. We so find. The evidence of such intent is clear and convincing. Decision will be entered under Rule 50. Footnotes
1. .↩